UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GERMAINE LEWIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 10 C 6447 |
| vs. ) | |
| ) | Magistrate Judge Rowland |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Germaine Lewis, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Commissioner's denial of his application for disability insurance benefits. The parties have filed a joint stipulation, which includes Mr. Lewis's claim for relief as well as the Commissioner's response. (Doc. # 23.) For the reasons set forth below, the Court remands this case for further proceedings consistent with this opinion.

### I. Procedural History

On December 29, 2006, Mr. Lewis filed applications for disability insurance benefits and supplemental security income benefits alleging disability on the basis of schizophrenia and other psychological impairments. (R. 268-69.) His claims were initially denied on April 12, 2007, and again upon reconsideration on November 17, 2007. (R. 165-67.) Following Mr. Lewis's request, an Administrative Law Judge ("ALJ") conducted hearings on October 1, 2009 and November 12, 2009. On November 25, 2009, the ALJ issued a written opinion denying benefits. (R. 9-34.)

1

Mr. Lewis requested Appeals Council review, but that request was denied, which rendered the ALJ's decision final. (R. 1-3.) Mr. Lewis requested judicial review of that decision, for which this Court has jurisdiction pursuant to 42 U.S.C. § 405(g). Pursuant to the consent of the parties and 28 U.S.C. § 636(c), the case was reassigned to this Court on February 4, 2011 for all further proceedings, including the entry of final judgment. (Doc. # 11.)

## II. Summary of Administrative Record

Mr. Lewis was born on March 10, 1980. (R. 275.) He currently lives in Chicago with his mother and younger brother. (R. 375.) The educational records before the ALJ showed that, although Mr. Lewis was classified as having a learning disability, he performed normally in school. (R. 18.) He graduated with a rank of 70 in a class of 201, with good attendance. He was not regarded as having significant behavior or emotional problems as an adolescent. (*Id.*) Mr. Lewis worked at UPS from November 11, 1998 to August 1, 2005 and has not worked since. (R. 375.)

The earliest records of psychiatric treatment show that Mr. Lewis made four trips to Stroger Hospital's emergency room in April, June, July, and August 2006. (R. 450-477.) During those visits, Mr. Lewis requested prescription refills of various psychotropic medications. (*Id.*) At the June visit, the hospital staff scheduled Mr. Lewis for an out-patient psychiatric appointment at the Fantus Psychiatric Clinic. (R. 383-390.) Records from that appointment, which took place on September 1, 2006, show that Mr. Lewis was evaluated by a clinician named Scott Simmons. (R.

475.) During the examination, Mr. Lewis reported that he was hospitalized in 2000 for "stress" and in 2002 because he thought his upstairs neighbor was saying bad things about him and wanted to hurt him. (R. 474.) Mr. Simmons described Mr. Lewis as having a blunted affect with very little emotional variance. (R. 475.) He also described Mr. Lewis as frequently unable to expand on ideas though he appeared to be trying to. (*Id.*) In addition to examining Mr. Lewis, Mr. Simmons also called Mr. Lewis's mother and spoke to her about her son's condition. (R. 474.) Mr. Lewis's mother reported that her son had a history of hearing voices and difficulty getting along with others at his place of work. (*Id.*) Mr. Simmons diagnosed Mr. Lewis with schizophrenia but described Mr. Lewis's condition as "currently asymptomatic." (R. 476.) Mr. Simmons assigned Mr. Lewis a Global Assessment of Functioning ("GAF") score of 80, which indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." (*Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition* ("DSM-IV"), p. 32.)

On December 15, 2006, Mr. Lewis returned for a follow-up at the Fantus Clinic and was examined by the attending psychiatrist, Dr. Alessandra Tachauer. (R. 473.) Dr. Tachauer noted that Mr. Lewis was aggressive in his behavior, was talking to himself, and appeared to be responding to internal stimuli. (*Id.*) Dr. Tachauer increased Mr. Lewis's daily dose of Risperdal to four milligrams per day

and added a prescription for clonazepam (generic for Klonopin, which is often prescribed to treat anxiety). (*Id.*) She also referred Mr. Lewis to the social services department. (*Id.*)

Two weeks later, on December 29, 2006, Mr. Lewis filed the instant application for disability benefits, alleging that he has been disabled since August 1, 2005, which is when he stopped working at UPS. (R. 262-67.) The Social Security Administration then referred Mr. Lewis for a consultative examination with Dr. Zvezdana Djuric-Bijedic, a licensed clinical therapist, which took place on February 3, 2007. (R. 374-78.) In that examination, Mr. Lewis reported that his psychiatric problems began between 2000 and 2003. (R. 375.) He complained of stress, accompanied by rapid heart-beat, and described his quality of sleep and appetite both as poor. (R. 374.) He denied experiencing auditory or visual hallucinations but admitted that he sometimes talked out loud to himself. (*Id.*) Mr. Lewis described his work history, stating that he had stopped working at UPS in part to care for his mother who was sick at the time. (R. 377.) The doctor noted that Mr. Lewis "presents with significant paranoid delusions about people who want to hurt him, or talk about him . . . ." (R. 377.) He then diagnosed Mr. Lewis with schizophrenia (paranoid type) and possible schizoaffective disorder (depressed type). (R. 377.) Dr. Djuric-Bijedic assigned a GAF score of 45, which indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessive rituals, frequent shoplifting) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family,

and is unable to work; child frequently beats up younger children, is defiant at home, and is failing in school." (DSM-IV at 32.)

From February 8, 2007 to September 9, 2009, Mr. Lewis continued to attend regular appointments with his tending doctors and clinicians at the Fantus Clinic. (R. 472.) Records from those visits indicate that Mr. Lewis experienced some ups and downs in managing his schizophrenia. Clinic staff sometimes described him as "stable" and "relaxed" and other times as exhibiting "disorganized" and "preoccupied" behavior. (R. 480-88.) During some visits he reported sleeping well, and in others he reported insomnia. (*Id.*) On June 5, 2008, his doctor noted that he seemed depressed and added an anti-depressant to his medication. (R. 485.) His mother, who attended some of these appointments, reported that Mr. Lewis would spend long periods in the bathroom doing "breathing exercises," which involved holding his breath for long enough to feel faint. (R. 481-83.) Mr. Lewis explained that he did the breathing exercises to promote physical fitness because he wanted to protect his brother from neighborhood bullies. (*Id.*)

In addition to the above information, the ALJ considered certain opinion evidence submitted by state agency psychiatrist Dr. Tomassetti and independent psychiatrist Dr. Puntini. As described below, Drs. Tomassetti and Puntini reached materially divergent opinions about the severity of Mr. Lewis's impairments. The ALJ did not consider any opinion evidence from Mr. Lewis's treating physicians because, according to Mr. Lewis's testimony, his primary doctor at Fantus Clinic

5

told him she was not authorized to complete the impairment forms provided by Mr. Lewis's attorney. (R. 24.)

Dr. John Tomassetti issued his opinion on March 31, 2007. Dr. Tomassetti diagnosed Mr. Lewis with depressive syndrome, characterized by pervasive loss of interest in almost all activities, sleep disturbance, and difficulty concentrating or thinking. (R. 412.) He did not diagnose Mr. Lewis with any schizophrenic, paranoid, or other psychotic disorder. (R. 409.) The doctor opined that Mr. Lewis's condition resulted in a few mild and moderate limitations, but he was not "markedly limited" in any way. (R. 423-24.) Dr. Tomassetti also opined that Mr. Lewis could perform and sustain simple, routine tasks, despite his mental impairment. (R. 425.)

Dr. Nicollette Puntini examined Mr. Lewis on October 9, 2009. (R. 496-507.) Dr. Puntini's notes from that examination describe Mr. Lewis's disturbed behavior in detail. She states that Mr. Lewis appeared agitated and continually rocked back and forth. (R. 497.) He appeared to be responding to internal stimuli, and repeatedly stated in a loud voice, "Stone Cold Steve Austin!" (*Id.*) He was so unable to focus on the examination, that Dr. Puntini called Mr. Lewis's mother into the examination room to calm him. (*Id.*) Mr. Lewis's mother was able to calm him somewhat by reminding him of the importance of answering the examiner's questions. But, throughout the clinical interview, Mr. Lewis was able to give only limited answers to Dr. Puntini's questions, due to "the interference of his psychological problems." (R. 498.)

Dr. Puntini's report indicates that Mr. Lewis suffered from auditory hallucination, with varying intensity, since the tenth grade. (R. 498.) He stated that he hears the voices of wrestlers even when he is not watching wrestling on television, and that the voices command him to perform numerous sit-ups and push-ups, as well as breathing exercises, to prepare for wrestling matches. (R. 498, 500.) He also stated that the voices urge him to put other people in extreme wrestling holds, but he has never followed through with those commands because he is afraid of hurting someone. (R. 498.) As for his interpersonal functioning, Mr. Lewis reported that he has difficulty interacting with others because he often becomes convinced that they are talking about him in a disparaging manner. (R. 501.) He reported that he has not been in a romantic relationship since high school and does not have any friends; "I mostly stay to myself," he said. (R. 501.) Regarding his decision making, Mr. Lewis stated that he relies on his mother and father for advice and guidance on many matters. (*Id.*) When asked about his experience working at UPS, Mr. Lewis stated that he loaded trucks. (R. 502.) He recalled that he would often hear the voice of wrestler Stone Cold Steve Austin, and that the voice was so persistent that Mr. Lewis would verbally respond to it. His coworkers would ask him what he was doing. (*Id.*) Mr. Lewis stated he was laid off in 2005 and has not worked since. (*Id.*)

Dr. Puntini measured Mr. Lewis's full-scale IQ score as 53, verbal IQ as 61, and performance IQ as 52. (R. 503.) Dr. Puntini stated that those scores fell within the mentally retarded range, but noted that she did not consider those scores to be

an accurate representation of Mr. Lewis's actual level of intelligence, because his psychological problems interfered with his ability to maintain an adequate level of attention and concentration during the testing process. (R. 504 (opining that the results were "reflective of, in part, the interference of the claimant's severe psychological problems.".) She diagnosed Mr. Lewis with schizophrenia characterized by delusions or hallucinations and emotional withdrawal and/or isolation. (R. 508-09.) Finally, in rating his functional limitations, she opined that Mr. Lewis is "markedly limited" in the vast majority of categories listed on the residual functional capacity form. (R. 522-23.)

The ALJ in this case ultimately concluded that, although Mr. Lewis's medically determinable impairments (schizophrenia and depression) could reasonably be expected to cause the alleged symptoms, Mr. Lewis's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible. (R. 30-31.) She reasoned that if Mr. Lewis was really suffering from hallucination and other severe impairments, those issues would have been noted in his medical records from the Fantus Clinic or the emergency room visits. (R. 30.) The ALJ went on to explain that the contemporaneous treatment records indicate that Mr. Lewis's mental health conditions are well-controlled; and those records are more credible than the evidence generated during the disability proceedings, in which Mr. Lewis presumably had an incentive to fabricate or exaggerate impairments. (R. 31.) Accordingly, the ALJ held that Mr. Lewis is not disabled under the Social Security Act and denied his application for benefits. (R. 34.)

## III. Standard of Review

The standard for review of an appeal from the Social Security Administration denying disability benefits is well established. To establish a "disability" under the Social Security Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A claimant must demonstrate that his impairments prevent him from performing not only past work, but also any other work that exists in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A).

The regulations under the Social Security Act set forth a five-step process to determine whether a person is disabled. 20 C.F.R. § 404.1520(a)(4). Under these regulations, an ALJ must consider: (1) whether the claimant presently has substantial, gainful employment; (2) whether the claimant's alleged impairment or combination of alleged impairments is severe; (3) whether the claimant's impairment(s) meet(s) or equal(s) the specific impairments that are listed in the appendix to the regulations as severe enough to preclude gainful employment; (4) whether the claimant is unable to perform her past relevant work; and (5) whether the claimant is unable to perform any other work that exists in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 404.1520(b)-(f); *see also Young v. Sec'y of Health and Human Serv.*, 957 F.2d 386, 389 (7th Cir. 1992).

A finding of disability requires an affirmative answer at either Step 3 or Step 5. *See* 20 C.F.R. § 404.1520(a)(4). A negative answer at any step other than Step 3 precludes a finding that the claimant is disabled. *Young*, 957 F.2d at 388. The claimant bears the burden of proof at Steps 1-4. In cases of severe impairment, the ALJ's analysis typically involves an evaluation of the claimant's residual functional capacity ("RFC") to perform past relevant work. *See* 20 C.F.R. § 404.1520(e). This RFC is used for purposes of Step 4 to determine whether the claimant may work in her previous occupations. *Id.*

At Step 5, the burden shifts to the Commissioner, who must "provid[e] evidence that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do, given [his] residual functional capacity and vocational factors." 20 C.F.R. § 404.1560(c)(2). If a claimant's RFC allows him to perform jobs that exist in significant numbers in the national economy, then the claimant is not disabled. 20 C.F.R. § 404.1520(g)(1).

In reviewing the ALJ's decision, courts may not decide facts anew, reweigh evidence, or substitute their judgment for the articulated judgment of the ALJ. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The reviewing court will uphold the Commissioner's decision if it is supported by "substantial evidence," and is free of legal error. 42 U.S.C. § 405(g) (2004); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dray v. R.R. Retirement Bd.*, 10 F.3d 1306, 1310 (7th Cir. 1993) (quoting *Richardson v. Perales*,

402 U.S. 389, 401 (1971)). If conflicting evidence would allow reasonable minds to differ, the responsibility to determine disability belongs to the Commissioner (and ALJ, by extension), not the courts. *See Heir v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990); *see also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to evidence that the ALJ finds more credible).

However, an ALJ is not entitled to unlimited judicial deference. An ALJ must "build an accurate and logical bridge from the evidence to [his or] her conclusion," *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001), and "must confront the evidence that does not support his [or her] conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). The ALJ must consider all relevant evidence, and may not choose to disregard certain evidence or discuss only the evidence that favors his or her decision. *See Herron*, 19 F.3d at 334. Although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ must state the reasons he or she accepted or rejected "entire lines of evidence." *Id.* at 333; *see also Young*, 957 F.2d at 393 (in order for there to be a meaningful appellate review, the ALJ must articulate a reason for rejecting evidence "within reasonable limits"). The written decision must include specific reasons that explain the ALJ's decision, so that the reviewing court can ultimately assess whether the determination was supported by substantial evidence or was "patently wrong." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)).

11

## IV. Discussion

Mr. Lewis raises two related arguments in support of his request for reversal and remand: (A) the ALJ failed to properly evaluate the medical opinions in the record, namely by disregarding the opinion of Dr. Puntini; and (B) the ALJ's residual functional capacity assessment failed to fully account for all of Mr. Lewis's limitations. The Court addresses each argument in turn.

### A. The ALJ's Evaluation of the Medical Opinions

Mr. Lewis first contends that the ALJ erred in her evaluation of the medical opinions in this case. He argues that it was unreasonable to weigh Dr. Tomassetti's opinion greater than Dr. Puntini's opinion because (1) Dr. Tomassetti never actually examined Mr. Lewis, and (2) his opinion was no more consistent with the record than Dr. Puntini's opinion, despite the ALJ's conclusion to the contrary.

By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician" *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003); and in fact, the opinion of a treating source is entitled to *controlling* weight so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *accord Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008).

In this case, however, there is no medical opinion evidence from Mr. Lewis's treating physician, and the Court is left with conflicting opinions by the non-treating physicians Drs. Tomassetti and Puntini. In considering what weight to

give the opinions of non-treating sources, Section 404.1527 provides that the Commissioner (and, by extension, the ALJs) must consider the following factors:

(1) **Examining relationship.** "Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." 20 C.F.R. § 404.1527(c)(1).

(2) **Supportability.** "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. § 404.1527(c)(3).

(3) **Consistency with the record as a whole.** 20 C.F.R. § 404.1527(c)(4).

(4) **Specialization.** "We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5).

Here, the ALJ rejected Dr. Puntini's opinion largely on the basis of the third factor above, finding that her opinion was inconsistent with the record as a whole. (R. 24.) Dr. Puntini's finding that Mr. Lewis suffers from persistent auditory hallucinations was especially troubling for the ALJ, because she noted that "the contemporaneous progress notes quite consistently show that claimant explicitly denied having hallucinations." (R. 30.)

The Court finds, however, that the ALJ's finding of inconsistency is not supported by the record. Although the treating sources did not describe Mr. Lewis's auditory hallucinations with the same detail as Dr. Puntini did, they did indicate that Mr. Lewis was responding to internal stimuli, was talking to himself, was disorganized in his thinking, exhibited obsessive and aggressive behavior, and was

13

experiencing persistent delusional thoughts. (R. 469-74, 482, 484, 530.) The treating doctors' notes also show that Mr. Lewis's mother heard him talking to himself. (R. 469, 484.)

The ALJ is correct that Mr. Lewis did, on occasion, expressly deny that he was experiencing auditory hallucinations, but the ALJ failed to consider whether those denials might be related to Mr. Lewis's limited insight into his own condition. For example, on March 13, 2008, a treating clinician noted that Mr. Lewis denied experiencing paranoid delusions, but that his insight into his condition "needs help." (R. 484.) Other treatment notes indicate that Mr. Lewis's treating physicians graded his insight as "fair," rather than "good." (R. 468, 530.) As Mr. Lewis points out, in patients with schizophrenia, an assessment of "fair" insight indicates that a patient may experience auditory hallucinations without being aware of what is happening:

> Insight refers to the patient's awareness of his or her mental illness and the ability to connect this disturbance to other problems...insight can be said to be good, fair, or poor. A patient who is aware that hallucinations and paranoia are features of a relapse of schizophrenia has good insight. If the same patient was unsure if these symptoms were a feature of the illness, or was not sure they were really happening, insight would be said to be fair or poor. The patient who insists that these phenomena are real and that the doctors are part of a conspiracy to confuse him has poor insight.

G. David Elkin, *Introduction to Clinical Psychiatry*, at 9 (1999).

Federal courts have long recognized that, in the context of mental illness, insight can play an important role in evaluating the claimant's credibility; and, by definition, a claimant with poor insight cannot be expected to understand the true nature of his impairments. *See Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir.

14

1996) (recognizing that claimant's delay in seeking treatment for depression was not a sufficient basis to reject medical opinion diagnosing depression because "those afflicted [with depression] often do not recognize that their condition reflects a potentially serious mental illness"); *Blankenship v. Bowen,* 874 F.2d 1116, 1124 (6th Cir.1989) (same); *Tempesta v. Astrue,* No. CV-08-00003, 138 Soc. Sec. Rep. Serv. 938, 2009 WL 211362, at *3 (E.D.N.Y. Jan. 28, 2009) (ALJ should not have relied on report from hospital personnel that the claimant said he was a successful businessman where the medical record indicated claimant suffered from delusions and had grandiose ideas); *Leon v. Astrue,* No. 08 C 7430, 2010 WL 934043, at *4 (N.D.Ill. March 5, 2010) (ALJ should not have discounted the severity of claimant's mental health disorder based on past denial of impairment without considering evidence showing that he lacked insight into nature of his disorder). Therefore, Mr. Lewis's denials of auditory hallucinations did not provide sufficient factual support for the ALJ to conclude that Dr. Puntini's opinion was inconsistent with the record as a whole.

The ALJ found the opinion of Dr. Tomassetti more consistent with the record than Puntini's, but Dr. Tomassetti did not even diagnose Mr. Lewis with schizophrenia. Instead, he opined that Mr. Lewis suffered from a depressive disorder. The fact that Dr. Tomassetti concluded that Mr. Lewis suffered from an entirely different disorder than the illness referenced throughout the treating physicians' medical records, shows that, if any opinion was inconsistent with the record, it was Dr. Tomassetti's.

15

Finally, Dr. Tomassetti did not examine Mr. Lewis, while Dr. Puntini did. Section 404.1527(c)(1) expressly provides that the ALJ should generally give more weight to opinions of doctors who examine the claimant when compared to doctors who do not.

Because the ALJ's dismissal of Dr. Puntini's opinion lacked factual support and failed to adhere to the requirements of Section 404.1527(c), the case must be remanded.

### B. The ALJ's Determination of Mr. Lewis's RFC

Mr. Lewis next argues that the case must be remanded because the ALJ's residual functional capacity ("RFC") assessment failed to fully account for all of Mr. Lewis's limitations. This argument is similar to the one above because Mr. Lewis again claims that the ALJ failed to account for the evidence from his treating physicians indicating that he suffers from auditory hallucination, interpersonal limitations, and poor judgment. The Court agrees.

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000; *see* 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."); SSR 96-8p, at *2 ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."). The RFC is based upon medical evidence as well

as other evidence, such as testimony by the claimant or his friends and family. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). In assessing a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe," and may not dismiss evidence contrary to the ALJ's determination. *Villano*, 556 F.3d at 563; *see* 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all relevant evidence in your case record."); SSR 96-8p, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.").

In this case, just as the ALJ failed to consider evidence of Mr. Lewis's impairments in dismissing Dr. Puntini's opinion as inconsistent with the record, she also failed to consider that evidence in arriving at Mr. Lewis's RFC. The ALJ found that Mr. Lewis "would be distracted only rarely by symptoms to the extent that he would be off task and not productive outside beak time, as long as he complies with prescribed treatment and medication." (R. 18.) But, the treatment notes—which the ALJ described as more reliable than evidence from disability proceedings (R. 24)—paint a different picture. On December 15, 2006, the notes indicate that Mr. Lewis was talking to himself and appeared to be responding to internal stimuli (R. 473.); on February 8, 2007, he was "still talking to himself" (R. 472); on August 29, 2007, he had disorganized behavior / thought content / thought process, with no improvement in behavior (R. 470); on March 13, 2008, his thought process was

circumstantial and tangential, and he was disorganized (R. 484); on July 23, 2007, he needed "more organization in his thoughts" and appeared "preoccupied, absent, and disorganized" (R. 471); on September 9, 2009, he stated that he "knows he has hallucinations that need treatment but [is] unaware of schizophrenia" (R. 530.)

Although the ALJ thoroughly described the medical evidence in her opinion, she failed to analyze the treating physician evidence noted above in arriving at Mr. Lewis's RFC. *See Keys v. Barnhart,* 430 F. Supp, 2d 759, 773 (N.D. Ill. 2006) (remanding where "the ALJ outlined claimants medical history in detail," but "offered almost no analysis of the medical evidence."); *see also Cuevas v. Barnhart,* No. 02 C 4336, 2004 WL 1588277, at * 13 (N.D. Ill. July 14, 2004) ("The ALJ does not appear to have examined this evidence, at least not in a way that allows the court to understand and evaluate how she arrives at her findings with respect to his physical impairments."

## V. CONCLUSION

For the reasons stated above, and pursuant to 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

ENTER:

_____
MARY M. ROWLAND
United States Magistrate Judge

Dated: October 25, 2012